# Richmond

## GREENLAND DEVELOPMENT CORPORATION V. ALLIED HEATING PRODUCTS COMPANY, INCORPORATED.

November 19, 1945.

Record No. 2956.

Present, All the Justices.

The opinion states the case.

W. R. *Ashburn*, for the plaintiff in error.

*Tazewell Taylor*, for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

In 1942 Greenland Development Corporation commenced the construction of seventy-five small dwelling houses on a tract of land which it owned in Norfolk county near the eastern limits of the city of Norfolk. When the foundations for the first ten houses were being laid out on the ground, a salesman for Allied Heating Products Company, Incorporated, interested the Greenland Corporation in a heating unit known as "Fluemaster." This type of furnace is manufactured by the Round Oak Manufacturing Company of Dowagiac, Michigan, and at that time Douglas & Seidler of Washington, D. C., were the eastern distributors, and the Allied Company was the exclusive dealer in the Norfolk area. Owing to war conditions, iron, steel, and other constituent materials ordinarily used in the construction of heating units, were unprocurable, and the "Fluemaster" furnace was designed to meet this situation.

The unit was designed to be installed and operated in this manner: A brick chimney was to be constructed through the interior of the house. Inside the chimney, at the first floor level, there was to be constructed a fire box, for burning

coal, lined with fire brick and covered with a metal plate or lintel. In this lintel there was an opening to which was attached a porcelain flue of smaller diameter than that of the brick chimney, for the purpose of carrying off the smoke and gases from the furnace. The hot air which accumulated in the space between the exterior of the flue and the interior of the chimney was forced, by a blower or fan, through metal ducts and distributed throughout the house. By means of thermostatic controls, common to heating plants, the fire in the furnace was to be controlled and the warm air blown through the ducts to suit the temperature demands of the interior of the building.

Because the Greenland Corporation was financing the construction of these houses through the Federal Housing Administration, it was necessary that the architects of this governmental authority approve this heating device. Accordingly, the Allied Company prepared and submitted to the Federal Housing Administration plans for the construction and installation of the furnaces, and obtained its approval thereof.

Pursuant to these negotiations the following written order for the purchase of these units was executed:

PURCHASE ORDER No. 413

ALLIED HEATING PRODUCTS CO., INC.
2706 Colley Avenue
Norfolk, Virginia

Date  July 22, 1942

To Douglas & Seidler
    Washington, D. C.

Enter Order For Greenland Development Corp.
                 East Princess Anne Road
                 Norfolk, Va.

Ship To ...................................................

At .......................................................

On or About........... Terms $100.91 when material
25 at once will advise on balance. is delivered. Balance as houses are completed.

F. O. B. Project          Name of Job..............

| QUANTITY | DESCRIPTION | AMOUNT |
|---|---|---|
| 75 | Round Oak Fluemaster Furnaces complete with blower, fire brick and insulation material, grills, registers, duct work completely installed at $202.50 a unit. Labor and brick to construct chimney to be furnished by purchaser. Chimney to be constructed according to instructions furnished by seller. Seller guarantees all materials furnished by them, for one year against defective material and workmanship. One year for service. Subject to F. H. A. approval. | $15,187.50 |

Important: Forward copy of customer's invoice to Allied Heating Products Co., Inc., showing thereon our order number and the amount of commission set up to our credit on your books.

Accepted: GREENLAND DEVELOPMENT CORP.
          By H. E. Sigmon
                    Pres.

                    ALLIED HEATING PRODUCTS CO., INC.
                              By W. E. Gardner

Pursuant to the terms of this order, the chimneys were constructed by the Greenland Corporation according to plans furnished by the Allied Company, and the latter company delivered and installed the furnaces in the respective houses.

The first ten houses were completed late in 1942 and early in 1943, and were promptly occupied by tenants. Trouble soon developed in most, if not all, of these furnaces. The metal grates became warped and the fire brick disintegrated. In some the thermostats burned out. In others the furnace tops or lintels melted, with the result that fumes and gases accumulated in the heating space in the chimney and were blown through the ducts into the living quarters.

The remaining sixty-five furnaces were installed and put in use in the winter of 1943-1944, and many of these gave trouble of a similar character. Four of the houses caught on fire, two of them twice.

The evidence on behalf of the Greenland Corporation was to the effect that these troubles were due either to faulty design and construction or defective materials. The evidence on behalf of the Allied Company tended to show that they were due to improper and careless operation of the units by the occupants of the houses. But whatever may have been the cause, the overwhelming evidence is that the furnaces did not perform satisfactorily.

From time to time, the Greenland Corporation complained of this situation to the Allied Company which replaced a number of damaged parts in several of the furnaces in the winter of 1943-1944. As this did not remedy the situation, a conference was had between the representatives of the seller, the buyer, and the Federal Housing Administration. Various remedies were suggested, but since these required the use of materials which were not then available, the situation was not essentially corrected.

In April, 1944, the Greenland Corporation filed its notice of motion for judgment in the court below against the Allied Company, claiming damages by reason of the defendant's breach of warranties, both express and implied, which it had made with respect to the furnaces. There was a trial before a jury which resulted in a verdict and judgment for the defendant which are now before us for review.

The main contentions of the parties both in the court below and here are these:

The Greenland Corporation contends that despite the fact that the purchase order was reduced to writing and signed by the parties, and is silent on the subject, there was an implied warranty by the seller that the heating units would be reasonably suitable for the purpose of heating the houses and would perform such service in a reasonably suitable manner.

The Allied Company contends that the written order is the embodiment of the entire contract entered into between the parties, and that since this order contained the express warranty that "Seller guarantees all materials furnished by them, for one year against defective material and workmanship. One year for service," there could be no further obligation on it by reason of an implied warranty.

There is a conflict of authority as to whether the incorporation into a written contract of an express warranty necessarily excludes any and all implied warranties. 46 Am. Jur., Sales, sec. 334, pp. 516-518. As the author there says (pp. 516-7), some courts take the view "that where parties have deliberately contracted in writing, it is conclusively presumed that their whole engagement and the manner and extent of their undertaking are embodied in the writing." Perhaps the leading case which supports this view is *DeWitt v. Berry*, 134 U. S. 306, 10 S. Ct. 536, 33 L. Ed. 896. Other cases expressing the same view are cited in the brief of the defendant in error.

On the other hand, as is pointed out in 46 Am. Jur., Sales, sec. 334, p. 517, "the view is taken in a number of jurisdictions apart from statute that if the express warranty does not relate to the obligation created by the implied warranty, but relates to another matter as to which the writing is silent, or is not of the same import or effect, both kinds of warranty may exist under the same contract. It is generally held that an implied warranty of quality is not excluded by an express warranty unless it is inconsistent therewith."

In 1 Williston on Sales, 2d Ed., sec. 239, pp. 473-474, that distinguished author says: "In some cases it has been broadly stated that an express warranty in a contract to sell

or a sale necessarily excludes any implied warranty. · If
express warranties in a contract are in their nature incon-
sistent with the warranties which would have been implied
had none been expressed, it would indeed be violating the
intention of the parties to imply warranties; and express
warranties which relate to the same matter as those which
the law would otherwise imply may be deemed inconsistent,
but the principle should extend no farther. An express war-
ranty is generally exacted for the protection of the buyer;
not to limit the liability of the seller. The fact that a seller
expressly warrants a machine to be made of the best steel
ought not to exclude an implied warranty that the machine
is properly manufactured and will do the work such
machines are designed to do, if such warranties would other-
wise be implied. Excellent authority supported this view
at common law. And it is expressly so provided in the
Sales Act."

In *Hill* v. *Montgomery Ward & Co.*, 121 W. Va. 554, 4
S. E. (2d) 793, 795, 124 A. L. R. 1444, the West Virginia
court has approved and adopted the latter as being "the
more liberal rule."

The precise question has not been previously presented to
this court. It is true that in *International Harvester Co.* v.
*Smith*, 105 Va. 683, 688, 54 S. E. 859, there is a statement
which supports the view of the defendant in .error. But that
this statement is a *dictum* and not necessary to the decision
of the case, clearly appears from a reading of the complete
sentence: "It is a general rule of law that where there is an
express warranty there can be no implied warranty except as
to title; but the question presented by this record is not with
respect to the fitness of the machine or its suitability for the
purposes for which it was purchased, but turns upon the
identity of the thing delivered with the thing purchased."

In *Ford Motor Co.* v. *Switzer*, 140 Va. 383, 394, 125 S. E.
209, the broad statement is made that, "Where a party gives
a written warranty, it is presumed that the writing contains
all that is intended to be warranted, and, as a general rule,
no other warranty will be implied."

But there the contract expressly provided that the written warranty was "in lieu of all other warranties expressed or implied," and the lower court had instructed the jury, without objection, that the written warranty was the measure of the rights and liabilities of both parties.

Hence, we feel free to adopt, and do adopt, "the more liberal rule" as advocated by Mr. Williston, and recently approved by the West Virginia court in *Hill* v. *Montgomery Ward & Co., supra.*

Since the express warranty in the written order is in no wise inconsistent with the implied warranty of fitness and suitableness, contended for by the Greenland Corporation, both were binding on the seller.

In *Universal Motor Co.* v. *Snow*, 149 Va. 690, 140 S. E. 653, 59 A. L. R. 1174, we upheld a verdict and judgment based upon a finding that a purchaser of a corn mill had relied upon an implied warranty that the machine was reasonably fit and suitable for the purpose for which it was bought and which was known to the seller. There, as here, the purchase was based upon a written order, which, however, contained no warranties.

In that case we approved this principle (149 Va., at page 699): "When one contracts to supply an article in which he deals, to be applied to a particular purpose, so that the buyer necessarily trusts to the judgment or skill of the vendor, there is an implied warranty that it shall be reasonably fit for the purpose to which it is to be applied; and the better doctrine is that this rule applies to dealers as well as to manufacturers, and not to manufacturers alone."

See also, *Gerst* v. *Jones & Co.*, 32 Gratt. (73 Va.) 518, 521, 522, 34 Am. Rep. 773, where the principle is thus stated: "Where, however, the purchaser does not designate any specific article, but orders goods of a particular quality, or for a particular purpose, and that purpose is known to the seller, the presumption is the purchaser relies upon the judgment of the seller; and the latter, by undertaking to furnish the goods, impliedly undertakes they shall be reasonably fit for the purpose for which they are intended; * * * ."

The case at bar comes within these principles, and the lower court so ruled by granting "Plaintiff's Instruction No. 1-P." This instruction told the jury "that if they believe from the evidence that the plaintiff Greenland Development Corporation, exhibited the plans and specifications for the houses which it proposed to construct, to the defendant Allied Heating Products Company, Incorporated, and that such defendant with knowledge of the purpose for which the plaintiff desired to procure heating units, recommended the Fluemaster heating units for use in said houses, in consequence whereof the plaintiff purchased these units in reliance upon such recommendation, then the law implies a warranty by the seller that said heating units would be reasonably suitable for the purpose of heating said houses, and would perform the function for which they were purchased in a reasonably sufficient manner."

But, on the other hand, the court below granted "Defendant's Instruction No. 3-D" as follows: "The court instructs the jury that if they believe from the evidence that the defendant furnished the plaintiff with furnaces *as specified in the contract and under the conditions as called for therein*, but that there was a failure on the part of the plaintiff or its tenants to operate said furnaces in a reasonably intelligent and efficient way and to exercise reasonably competent and intelligent supervision of the same, and that the failure, if any, to obtain satisfactory results with said furnaces was directly attributable to failure so to do, and to no inherent and incurable vice· of said furnaces, then the jury is instructed that they shall find for the defendant." (Italics supplied.)

When this instruction was offered, counsel for Greenland Corporation objected on the ground that the italicized language was misleading, that it would lead the jury to believe "that the obligations of the parties are limited to the language of the written purchase order," and to that extent it was in conflict with "Plaintiff's Instruction No. 1-P."

That this was the effect if not the purpose of the language objected to is practically admitted in the brief of the defen-

dant in error, where it is said: "The plaintiff has no hesitation in claiming under this written contract when presumably it suits its purpose * * * , but inconsistently refuses to be bound when such portion of the contract as limits its claim is invoked." Indeed, the main contention of the defendant in error is that the written warranty was the measure of the rights and liabilities of the parties.

Under "Plaintiff's Instruction No. 1-P," *supra*, the court had instructed the jury that the written order was not the limit of the plaintiff's claim, but that in addition thereto it had the right to rely upon the implied warranty of the fitness and suitableness of the furnaces sold to it by the defendant.

Objection was also made to "Defendant's Instruction No. 3-D" on the ground that the jury were told that if they believe from the evidence that the unsatisfactory results were directly attributable to the improper operation of the furnaces, "and to no inherent and incurable vice" therein, then they should find for the defendant. As pointed out by counsel for the plaintiff to the court below, it is entirely possible that the vice in the furnaces might have been "curable" and yet they might not have come up to the requirements of the implied warranty of suitableness and fitness for the work required of them. In other words, the plaintiff's right to recover was not dependent upon whether the defects, if any, in the furnaces were curable or incurable.

In our opinion, the trial court should have modified this instruction to meet these objections.

The argument is made before us that since the written order contained the provision that the installation of the particular furnace was "subject to F. H. A. approval," and that since this approval had been obtained, the Allied Company had "completely discharged its obligation."

With this contention we can not agree. It is true that the construction of the building was being financed by the Federal Housing Administration and for that reason its approval of the type of construction, including the heating plant, was necessary. If it had not approved this type of

furnace, the purchase order could not have been carried out, and the seller would have been relieved of the obligation to deliver and the purchaser of the obligation to accept the furnaces. Clearly, that was the purpose of this provision.

The granting of "Defendant's Instruction No. 4-D" and "Defendant's Instruction No. 5-D" is assigned as error. These deal with the purchaser's duty to inspect and test the furnaces, its duty to complain of discovered defects within a "reasonable time" after their installation, and the effect upon its rights in the event the jury believed from the evidence that it failed to do so. No complaint is made that either instruction incorrectly states the applicable law, but it is argued that there is no evidence to support a finding that the plaintiff purchaser failed to complain within a reasonable time.

Since there must be a new trial, at which the evidence on this phase of the case may differ from that now before us, it is unnecessary that we discuss the question raised. Suffice it to say, that while there is substantial evidence that the purchaser did complain of the units, the testimony with respect to the time or date of such complaints is vague and indefinite.

The plaintiff in error contends that the court erred in its instructions with respect to damages. At its request the jury were instructed that if they found from the evidence that the plaintiff was entitled to a recovery, they "should fix its damages at such amount as will fairly compensate the plaintiff for the loss sustained," but that "proof of absolute certainty as to the amount of loss or damage is not essential when the existence of loss is established, and the facts and circumstances proven are such as to permit of intelligent and probable estimate of the amount of damage or loss sustained." This instruction accords with the rule laid down in *Wyckoff Pipe, etc., Co.* v. *Saunders*, 175 Va. 512, 518, 9 S. E. (2d) 318, 321.

Over the plaintiff's objection the court incorporated in an instruction, granted at the request of the defendant, the statement that the plaintiff "must establish by a preponderance

of the evidence" "each item of its claim for damages." It is argued that the last phrase is in conflict with the instruction which had been given at the plaintiff's request and is erroneous.

We do not agree with this argument. There is no conflict in the two instructions. The latter instruction, in effect, merely told the jury that if the plaintiff's claim consisted of several items, each must be proved by a preponderance of the evidence. This does not mean, as argued by the plaintiff in error, that each item must be proved "with absolute certainty." On the contrary, reading the two instructions together, it means that the plaintiff must prove each item of its claim in the same manner and to the same extent as outlined in the former instruction.

At the trial the plaintiff sought to prove that about the same time the units were installed in the plaintiff's houses, a number of similar units sold by the defendant were installed in Monticello Village, another housing project near Norfolk, and that these, too, failed to function properly. The rejection of this testimony is assigned as error.

As we read the record, the court rejected this testimony because the plaintiff was unable to show that the method of installation of the furnaces in the two projects was the same, or that a difference in the installation, if any, would not have affected the results. This ruling, in our opinion, was correct.

It developed during the testimony of the Federal Housing Administration's architect for the State of Virginia, that after complaint had reached the Washington office of the inefficiency of these heating units that office undertook to trace the history of the device in an effort to determine the cause of the alleged inefficiency. The plaintiff sought to prove by the architect the result of this investigation and that it showed that the device, as sold, differed from that as patented and previously used. The court rejected this testimony because the witness had not himself made the investigation, had no personal knowledge thereof, and that hence his testimony on the subject would be hearsay. While

this ruling is assigned as error, we are pointed to no reason why the court's action should have been otherwise. Plainly it was correct.

For the reasons stated, the verdict is set aside, the judgment complained of is reversed, and the case is remanded for a new trial in conformity with the views here expressed.

*Reversed and remanded.*